IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD BOXLEY | : | CIVIL ACTION |
| v. | : | No. 09-828 |
| JEFFREY BEARD, et al. | : | **THIS IS A CAPITAL CASE** |

MEMORANDUM

Juan R. Sánchez, C.J.                                                                        January 13, 2019

Petitioner Richard Boxley seeks discovery in support of his pending petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Although discovery is not available as a matter of course in habeas corpus proceedings, the Court may authorize discovery in such proceedings for good cause. After considering Boxley's two motions for discovery, the Commonwealth's answers to the motions, and the claims in Boxley's habeas petition, the Court finds Boxley has demonstrated good cause for much of the discovery he seeks. Boxley's motions for discovery will therefore be granted in part and denied in part as set forth herein and in the accompanying order.

**BACKGROUND**

On October 19, 2000, Boxley was convicted of first-degree murder and other offenses in connection with the June 11, 1997, shooting death of Jason Bolton. Boxley was sentenced to death on the first-degree murder charge. His codefendant, Jose Busanet (also known as "Tito Black"), was tried separately for Bolton's murder in February 1999. Busanet was also convicted of first-degree murder and sentenced to death.

At Boxley's trial, two witnesses identified him as a participant in the shooting.[1] Tamicka Johnson testified that she saw Boxley (whom she had not previously met) and Busanet at the home

---

[1] The description of the trial evidence against Boxley is drawn largely from the Pennsylvania Supreme Court's opinion on his direct appeal. *See Commonwealth v. Boxley*, 838 A.2d 608, 615-16 (Pa. S. Ct. 2003).

of LaDonna Johnson before and after the shooting. According to Tamicka Johnson, before the shooting, Boxley and Busanet discussed a plan to kill Bolton. Both men had guns: Boxley had a .357 magnum revolver, and Busanet had a 9 mm handgun. After the shooting, Boxley and Busanet were at LaDonna Johnson's house with a third coconspirator, Wilson Melendez. While there, Busanet told Tamicka Johnson he and Boxley had "got[ten]" Bolton. *Boxley*, 838 A.2d at 616.

Melendez also testified for the prosecution at Boxley's trial. Melendez stated he first met Boxley at LaDonna Johnson's house on the day of the shooting and provided the following account of the shooting. At Busanet's request, Melendez left the house to go to the grocery store with Boxley. On the way, Melendez spotted Bolton. Boxley went to tell Busanet, and the three men then followed Bolton. As Boxley approached, his gun accidentally discharged. Boxley pulled the gun out and began firing at Bolton. Busanet also shot at Bolton, who died from a gunshot wound to the chest. Boxley, Busanet, and Melendez fled the scene and returned to LaDonna Johnson's house, where Boxley and Busanet celebrated the shooting.

The Commonwealth also presented testimony from a ballistics expert, Pennsylvania State Trooper Kurt Tempinski. Tempinski testified that shell casings recovered from the scene of the shooting matched those from a 9 mm gun linked to Busanet, and that two metal bullet jackets recovered from the scene matched those from a .357 magnum that had been turned over to the police and identified as having been used by Boxley.

On direct appeal, the Pennsylvania Supreme Court affirmed Boxley's conviction but vacated his death sentence. On remand, Boxley was again sentenced to death in September 2004 following a new penalty hearing. The Pennsylvania Supreme Court affirmed this death sentence in May 2008, and the U.S. Supreme Court denied certiorari in November 2008.

In February 2009, Boxley filed a pro se Post Conviction Relief Act (PCRA) petition in the Court of Common Pleas of Berks County. Boxley later filed a counseled PCRA petition, but the proceedings on that petition stalled, as described in the order entered in this case on September 27, 2019.

In light of the lack of meaningful progress on his state PCRA petition, on March 27, 2019, Boxley filed the instant federal habeas petition and consolidated memorandum of law. Boxley argued he should be excused from exhausting his federal constitutional claims in state court because the inordinate delay in the state PCRA proceedings rendered the state system effectively unavailable to him. The Commonwealth moved to stay Boxley's federal habeas petition and hold it in abeyance pending the outcome of the state proceedings. On September 27, 2019, the Court denied the stay request without prejudice to the Commonwealth's right to renew the request once there was evidence the proceedings had resumed in state court. In his opposition to the stay and abey petition, Boxley noted that several discovery motions filed in state court remained outstanding. The Court's order denying the petition directed Boxley to file any outstanding discovery motions in this Court.

In his federal habeas petition, Boxley raises 31 claims for relief. Of particular relevance to the instant discovery motions, Boxley alleges the Commonwealth violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to produce the Reading Police Department's interview of Rafael Figueroa (also known as "Lata"), who allegedly dropped the shooters off at LaDonna Johnson's house before the shooting and picked them up afterwards in a maroon van. Boxley alternatively argues his trial counsel was ineffective for failing to investigate Figueroa and call him as a witness. Boxley also raises several claims regarding the ballistics evidence, including claims of ineffective assistance of counsel and *Brady* and other due process violations relating to

this evidence. His claims include that his trial counsel was ineffective for failing to investigate and challenge the firearms and toolmark examination, testimony, and evidence and to seek independent testing of the ballistics evidence.

On October 16, 2019, Boxley filed two discovery motions. The first seeks discovery regarding Figueroa, the alleged getaway driver. Boxley claims Figueroa was interviewed by the Reading Police Department in connection with the Bolton homicide but the interview was never produced to him in discovery. The second seeks discovery of the ballistics evidence that was evaluated by the Commonwealth's expert along with certain documentation regarding that expert's analysis. Boxley seeks this evidence so that his expert may test it independently. The Commonwealth opposes both motions. As explained below, Boxley's motion for discovery regarding Figueroa will be granted in part and denied in part without prejudice. His motion for discovery regarding ballistics evidence will be granted.

**DISCUSSION**

Under Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts, discovery may be authorized in habeas corpus proceedings upon a showing of good cause by the party seeking discovery. A petitioner satisfies the good cause standard "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)); *accord Lee v. Glunt*, 667 F.3d 397, 404 (3d Cir. 2012); *see also Payne v. Bell*, 89 F. Supp. 2d 967, 970 (W.D. Tenn. 2000) (holding a petitioner "need not show that the additional discovery would definitively lead to relief" but "need only show good cause that the evidence sought would lead to relevant evidence regarding his petition").

### A. Rafael Figueroa

Boxley's request for discovery regarding Figueroa is supported by good cause insofar as he seeks discovery regarding Figueroa's contacts with the Reading Police Department relating to the Bolton homicide and relationship to that homicide. Boxley has presented evidence that Figueroa was interviewed on at least one occasion by the Reading Police Department. Figueroa himself told Boxley's investigator that he spoke with Reading Police detectives about the Bolton homicide more than once. Decl. of Randall Olsen ¶ 2, Feb 16, 2012; Decl. of Randall Olsen ¶ 2, Feb. 11, 2013. He also told the investigator that he was interviewed within two weeks of the June 11, 1997, shooting by Detectives Schade and Cabrera in the presence of his attorney, Emmanuel Dimitriou. Decl. of Randall Olsen ¶ 5, Feb. 11, 2013. Although Dimitriou has since died, his records reflect that he provided legal services to Figueroa in June 1997. Decl. of Eleni Dimitriou Geishauer, Esq. ¶¶ 1, 5, Jan. 17, 2013. And Schade confirmed to Boxley's investigator that the interview had occurred. Decl. of Randall Olsen ¶¶ 3, 6, Oct. 16, 2013. In addition, a redacted August 28, 1997, FBI report containing information regarding the Reading Police Department's investigation of the Bolton homicide describes a June 23, 1997, interview of an individual who could be Figueroa. *See* Pet. Ex. 36.

Boxley has also demonstrated that Figueroa's interview(s) may support his *Brady* and/or ineffective assistance of counsel claims if the facts are further developed. Figueroa told Boxley's investigator that, when he was interviewed by the police, he told them he had driven Busanet on the day of the shooting. But he denied driving Boxley. Evidence that Figueroa drove only Busanet, and not Boxley, on the day of the shooting could have been exculpatory because other evidence collected by the police demonstrated that Figueroa drove both shooters on the day of the shooting.

5

After the shooting, police received information that Figueroa, who was reportedly Busanet's boss in the drug business, had dropped the shooters off at LaDonna Johnson's house on the morning of the shooting and picked them up afterward. Tamicka Johnson told police that the shooters had arrived at LaDonna Johnson's house in a maroon minivan and were later picked up by the same van. Mot. for Discovery (Figueroa) ¶¶ 5, 8, 13 n.3. The van in question, which Tamicka Johnson identified at trial, was owned by Figueroa. *Id.* ¶¶ 3, 8. And the van returned to pick up the shooters after a phone call in which they instructed Figueroa's girlfriend to tell Figueroa "to come and get them right away because they just killed someone." *Id.* ¶ 5.

When interviewed by Boxley's investigator, Figueroa admitted that he picked Busanet up on the day of the Bolton homicide after receiving a call from Busanet at his girlfriend's house—and that he told the police as much. Decl. of Randall Olsen ¶ 8, Feb. 11, 2013. He nonetheless denied having picked Boxley up on the date of the homicide or at any time. *Id.* This denial by the alleged getaway driver may cast doubt on whether Boxley was involved in the shooting, particularly in light of the conflicting information police received as to the identity of the second shooter.[2] Boxley's allegations are therefore sufficient to warrant discovery regarding Figueroa's interview(s) in this capital case.[3] *See Lopez v. Beard*, No. 04-4181, 2017 WL 1293389, at *7 (E.D. Pa. Mar. 3, 2017) (noting more liberal discovery is appropriate in a capital case).

---

[2] Witnesses consistently identified "Black" (i.e., Busanet) as one of the shooters but inconsistently identified the second shooter as either "White" or "Face" or "Rich." Mot. for Discovery (Figueroa) ¶¶ 2-5.

[3] As Boxley acknowledges, the FBI report he cites in support of his assertion that Figueroa was interviewed by the Reading Police Department appears to contradict Figueroa's denial of having driven Boxley on the day of the shooting. The report recounts information provided by a Reading Police detective that, on June 23, 1997, an unnamed individual (believed to be Figueroa) was interviewed by the Reading Police Department and stated that, on the day of the shooting, he drove another unnamed individual and Boxley around Reading, Pennsylvania, and subsequently took them to New York. Pet. Ex. 36 at 2. This information was not relayed to the FBI until August

6

There remains the question of the scope of discovery that should be authorized. Boxley seeks discovery not only of documents pertaining to Figueroa's interview(s), but of "all documents pertaining to Rafael Figueroa in the possession of the Reading Police or the Berks County District Attorney's Office." Mot. for Discovery (Figueroa) ¶ 22. Specifically, Boxley asks the Court to order the Commonwealth to produce

> all documentation and all information, written or otherwise in its possession and control, regarding Rafael Figueroa, his relationship with the Reading Police Department or any of its officers, investigators, detectives, or any other personnel, and any information in its possession or control relative to Rafael Figueroa's knowledge of, or involvement with, before, during, or after, the homicide of Jason Bolton.

*Id.* at 11. The Court will permit discovery of documentation and information regarding any interview of Figueroa by the Reading Police Department or any contacts between Figueroa and the Reading Police Department relating in any way to the Bolton homicide because this discovery might reveal evidence to support Boxley's *Brady* claim. The Court will also permit discovery of information in the Commonwealth's possession or control relating to Figueroa's knowledge of, or involvement with, before, during, or after the Bolton homicide. Insofar as Boxley seeks discovery of documents and information concerning Figueroa's relationship with the Reading Police Department more generally, however, this request is overly broad at this juncture. Boxley has not shown how such discovery might support his claims. This aspect of Boxley's motion will be denied without prejudice at this time.

---

1997, some two and a half months after the shooting, by which time Busanet had implicated Boxley in the shooting. Boxley contends Figueroa likely did not identify him in the interview, but that the Reading detective used his name in providing information to the FBI because Busanet had subsequently implicated him.

7

There is also a question as to whether responsive documents or information exist. In March 2011, the Commonwealth advised Boxley that, as of that date, it "ha[d] been unable to locate any documentation of an oral or written interview with Rafael Figueroa, a/k/a Lata, during the investigation of this case," but that it was "still searching the records" and would "advise [Boxley] of the results of [the] search accordingly." Letter from Alisa R. Hobart to Lynn A. Ellenberger, Mar. 28, 2011 (attached to Boxley's Mot. for Discovery). In its response to the instant discovery motion, the Commonwealth has represented that the Assistant District Attorney assigned to this case "personally reviewed the discovery contained within the files for this prosecution maintained by the Berks County District Attorney's Office, as well as a copy of the documents contained within the records office of the Reading Police Department related to this investigation," but that "[n]o reference to an oral or written interview with Rafael Figueroa was located within these documents." Answer to Mot. for Discovery (Figueroa) ¶ 7.

In light of the Commonwealth's position, and given the evidence in the record that Figueroa was interviewed by the Reading Police Department in connection with the Bolton homicide, the Court will order the Commonwealth to provide an affidavit describing the steps it has taken to (1) determine whether Figueroa was interviewed by the Reading Police Department in connection with the Bolton homicide, (2) determine whether any documents relating to the interview(s) exist, and (3) search for documents and information relating to any such interview(s).

**B.**   **Ballistics Evidence**

Boxley has also shown good cause for discovery of the ballistics evidence he seeks. At trial, the Commonwealth's ballistics expert, Trooper Tempinski, testified that metal bullet jackets recovered from the scene of the Bolton shooting matched a .357 magnum that was identified as having been used by Boxley "to the exclusion of all other firearms." Mot. for Discovery

(Ballistics) ¶ 6. According to Boxley, although the Commonwealth produced a report from Tempinski before trial, it did not produce any notes, raw data, graphs, photographs, or other documentation supporting his conclusions. *Id.* ¶ 8. Boxley's trial counsel did not seek independent testing of the ballistics evidence and conducted no cross-examination of Tempinski. *Id.*

As noted, Boxley raises several claims regarding the ballistics evidence in his case, including claims that his trial counsel was ineffective for failing to investigate and challenge the firearms and toolmark examination, testimony, and evidence and failing to seek independent testing of the ballistics evidence. Boxley seeks an order requiring the Commonwealth to disclose the ballistics evidence and related documentation from the police testing for independent review by his expert. He argues independent review and testing is necessary to show that he was prejudiced by counsel's errors, including counsel's failure to seek independent testing.

In support of this request, Boxley contends that some of Tempinski's findings may have been incorrect and that Tempinski misrepresented the degree of reasonable scientific certainty for his conclusions. Specifically, Boxley alleges that, unbeknownst to the defense, the Reading Police commingled ballistics evidence from the Bolton shooting on June 11, 1997, with ballistics evidence from an earlier shootout involving Busanet, Bolton, and others on June 5, 1997. *See id.* ¶ 10. Tempinski concluded that one of the bullet fragments from the June 5, 1997, shootout was from the same .357 magnum purportedly used by Boxley. *Id.* ¶ 11. However, there is no evidence that Boxley was at that earlier shootout. *Id.* And Melendez, who was present at the June 5, 1997, shootout stated he "know[s] for certain that a .357 was not involved" in that shootout; only 9 mm guns were used. *Id.* Boxley also alleges the toolmark analysis performed by Tempinski cannot support a conclusion of a match to the exclusion of all other firearms. *See id.* ¶¶ 14-15.

9

Boxley's allegations provide reason to question the reliability of Tempinski's conclusions and establish good cause for the discovery he seeks. While there could be other explanations for Boxley's allegations, the Court finds that they raise enough questions that further discovery may show that Boxley may be entitled to relief. The Court will therefore order the Commonwealth to produce all the physical ballistics evidence for examination and testing by Boxley's expert, including all "weapons and all of the various bullet casings and bullet fragments obtained by the Reading Police Department and submitted to the laboratory for analysis and comparison testing in connection with the Jason Bolton homicide and the shootout the week prior at 10th and Chestnut Streets." *Id.* ¶ 17. The Commonwealth does not object to having a defense expert examine the physical ballistics evidence, upon a finding of good cause, "as long as the chain of custody of the physical evidence can be maintained during the transportation of the physical evidence and during the testing process by the defense expert." Answer to Mot. for Discovery (Ballistics) ¶ 22. And Boxley is amenable to taking "any reasonable and necessary precautions for the production of the ballistics evidence to preserve the chain of custody and integrity of the evidence." Mot. for Discovery (Ballistics) ¶ 26. The Court will therefore direct the parties to meet and confer to establish a mutually agreeable procedure for the production of this evidence that addresses these concerns and to present a proposed order memorializing the agreed procedure to the Court.

The Court will also order the Commonwealth to produce all relevant documentation from the police testing to the extent these materials have not already been produced.[4] This includes

> all of the Commonwealth's experts' supporting bench notes, worksheets, diagrams, sketches, notes, any data recorded, either manually or digitally related to the

---

[4] As Boxley acknowledges, the Commonwealth produced some worksheets and bench notes generated by Tempinski to the defense during the PCRA proceedings. Mot. for Discovery (Ballistics) ¶ 9. The Commonwealth denies that it is in possession of any additional documentation related to the pretrial ballistics testing, other than what has already been provided to Boxley. Answer to Mot. for Discovery (Ballistics) ¶ 18.

examination of the ballistics evidence, all images, including photographs taken during the examination and/or photomicrographs recorded through the microscope, either digital or those generated from the original film negatives, copies of [any] and all videos that were made or used during the examination of the ballistics evidence, and anything further that pertained to the ballistics, toolmarks and firearms testing done by the Commonwealth's expert.

*Id.* ¶ 18. Finally, the Court will order the Commonwealth to produce the policy and procedure manual for the laboratory that conducted the testing and the laboratory's guidelines for testing and rules and regulations. Before producing such manuals, guidelines, and rules and regulations, the Commonwealth shall determine whether the Office of General Counsel for the Pennsylvania State Police has any objection to the disclosure. *See* Answer to Mot. for Discovery (Ballistics) ¶ 18. Any objection shall be presented to the Court for resolution before these materials are produced.

**CONCLUSION**

For the reasons set forth above, Boxley's motion for discovery regarding Rafael Figueroa will be granted in part and denied in part without prejudice, and Boxley's motion for discovery of regarding ballistics evidence will be granted as stated herein. An appropriate order follows.

BY THE COURT:


   /s/ Juan R. Sánchez
Juan R. Sánchez, C.J.